CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v. ALLEN.

Opinion delivered June 9, 1913.

RAILROADS—INJURY TO PERSON INVITED ON TRAIN—NEGLIGENCE.—Where a railroad company invited plaintiff, a town marshal, to board its cars to protect them from being broken into, the invitation was to ride on a moving train in the usual manner in which it was intended it should be riden on, and the railroad company will not be held liable for an injury to plaintiff where he was injured while attempting to alight from the side of a car while it was in motion.

Appeal from Monroe Circuit Court; *Eugene Lankford,* Judge; reversed.

*Thos. S. Buzbee* and *Geo. B. Pugh,* for appellant.

1. The burden was on plaintiff to show the authority of Clary to authorize persons to ride on defendant's trains. He made no attempt to do so.

2. But if Clary had such authority, the invitation would embrace the right to ride on such trains and in such manner it is intended they should be ridden on. The injury was caused by plaintiff's own negligence.

*Thomas & Lee,* for appellee.

1. Plaintiff was more than a licensee as he was on the train by special invitation of Clary to protect defendant's property. 52 Fla. 327; 42 So. 854.

2. Clary was a general agent and had *apparent,* if not actual authority to make the invitation. 55 Ark. 627; 44 *Id.* 138.

SMITH, J. Appellee was the plaintiff below, and alleged in his complaint that he had been night marshal

of the city of Brinkley, and that on the night of June 19, 1912, he was at the depot of the defendant in that city and undertook to arrest two men, who had boarded a freight train of defendant; that in order to make the arrest plaintiff was compelled to go on top of a box car, and that before he could alight from said car the train began to move slowly, and that while undertaking to alight from said car he was run against by a box car on the sidetrack, which had been left in such close proximity to the main track that a person on the side of said train could not pass without being struck, and that plaintiff was knocked off the side of the car, on which he was riding, as it passed the car on the sidetrack.

The complaint further alleged that plaintiff had been instructed by the special agent of the defendant company, a Mr. Clary, to ride said train from the depot to the coal chute, so as to prevent cars from being broken into.

The answer specifically denied all the material allegations of the complaint, and alleged that Clary had no authority to instruct, or permit, plaintiff, or any other person, to ride upon defendant's freight cars, or any of them, and further alleged that plaintiff's injuries were the result of his own carelessness and negligence.

To support the allegations of the complaint, the following proof was offered. The plaintiff testified as follows:

"We were instructed by Mr. Clary to ride this train. There had been lots of merchandise cars and passenger cars, but more merchandise cars, that had things of different kinds stolen out of them. Mr. Clary told the chief, Mr. Owens, and myself to keep them out and ride these trains down there, and make a special effort to stop it. I had been doing that, I suppose—well, I made several trips down there before this night. This morning we were speaking about there were two hoboes in the depot. I went in there and asked them where they were going, and if they had tickets and they said "yes;" said

they wouldn't be in there if they didn't. I walked on out, and it was just about time for 44, going east. That is, the passenger going east. There was a train coming, and I thought that was it, and I was going to see where they went. It was a freight train, and I walked out, and one of these men got on the car ahead, and I caught a car just as it stopped for the crossing when they got on. There was another one got on lower down. I got on there and arrested one of them, and the other one was ahead of me. I had this one with me, and he was climbing down on the inside, and I was on the outside. He was on the ladder between the cars. It was dark and I couldn't see very far in front. It was about 3 o'clock in the morning. This car was sitting on the sidetrack. This car and the train had been striking together, I could hear that, and that called my attention to look around, but I could not see what was making the noise; but when the car got in a few feet of me I saw what it was, but didn't have time to jump, but I got close as I could to the car, and the one on the sidetrack knocked me off and sprained my ankle. I could not walk, and I thought my leg was broken. There was some more boys at the depot with me, and I got up the best I could and hopped up there, and they came down and got me to the depot and called up the doctor, and he treated me and put splints on my leg and kept them there about two weeks. The first few days it pained me terribly. I had to keep it up high to get any relief.

"I was working as night marshal of the city of Brinkley, under Mr. Owens. Mr. Clary was special agent of the defendant. He had instructed me to ride the train and make a special effort to stop thefts. On one occasion there were about sixteen or seventeen hams taken out. This was the occasion Mr. Clary made this request of me. This car, on the sidetrack, was so close to the train that a man on the side of the box car on the track that this train was on, could not pass without being struck. The car was bruised up by being struck by this

passing train. This was shortly after 3 o'clock in the morning.

"I went there for the purpose of making this arrest, in pursuance of instructions from Mr. Clary.

"I was the regular night marshal. The city of Brinkley pays my salary. I had been acting as deputy marshal for six months. I don't know how long the train was. I think it was a through freight train. I got on more towards the front than the back. I rode the train something like fifty or seventy-five yards to the first switch beyond the Cotton Belt crossing, I was on the right side, going east. I had the man arrested, and he was coming down the front end on the inside, between the cars, and I was coming down on the outside. I did not have hold of him, but expected to get off with him. I do not know what became of him after I got down. One of the men was two cars ahead. I did not get to him at all. The train was not going very fast at that time. I supposed it would stop at the coal chute. The train had come to a stop, and whistled for the Cotton Belt crossing when I got on. I was down almost to the Brinkley Hotel, and had that much of the length of the train ahead of me. Mr. Clary was not there that night that I know of."

L. C. Owens testified in substance as follows:

"I am city marshal of Brinkley. I know Mr. Clary. He is special agent of the defendant. When he comes to Brinkley he looks after broken-into box cars, and such things as have been lost on the railroad, and things of that kind."

Q. I will ask you, Mr. Owens, if you had any conversation with Mr. Clary, prior to this accident, with reference to cars being broken into at Brinkley, and, if so, state to the jury what it was, and if you had any instructions from him.

A. Along some time before that Mr. Clary came over there and said he was having a great deal of trouble about these things, and said he would like for me to give him all the assistance I could in protecting the com-

pany's interest about the depot and yards. They had some trouble on the passenger trains, which was supposed to happen at Brinkley, about the coal chute and up at the depot, and asked me to assist him in everything I could, and I did.

Q. State to the jury whether or not he said anything to you and Mr. Allen about riding trains from the depot to the coal chute and back.

A. He asked us to ride them. I don't know what the numbers are of these trains that go east sometimes in the morning. He wanted us to ride that train up to the coal chute, which is about half a mile, and then there is one that comes west inside of fifteen or twenty minutes, and sometimes we would sit down there until that train came back west; and, if it was late, we would walk back. I did that several times. I and Mr. Clary put in the big part of one night riding from the coal chute to the depot and back. So I told Mr. Allen to keep a close lookout around the depot and yards, as much so as possible, and especially around those passenger trains, and that is about all I know.

Q. You and Mr. Allen rode the trains back and forth between the depot and the coal chute?

A. Mr. Allen worked at night and I worked in the day. He would make his report that he had done so. I wasn't down there with him. I only rode the passenger trains myself.

Q. Mr. Allen was present when Mr. Clary gave you these instructions?

A. I can't say positively, but Mr. Clary gave me these instructions—to look after this, and, so far as I could to catch these criminals and hoboes, and I told Mr. Allen to keep a close lookout as far as he could.

Q. You told Mr. Allen that?

A. Yes.

"I rode the trains with Mr. Clary. He and I rode the passenger trains at night. I think it was 44 east, and 43 west, and then I worked two or three nights later. I recognized it was my duty, and the duty of my

deputies, to arrest all criminals, whether they were stealing from the railroad or not. It was as much our duty to protect railroad property as the property of anybody else.''

This was all the testimony, and it is very questionable whether it is sufficient to support the finding that Clary had authority to direct appellee to ride on appellant's train. But if Clary had authority to give this invitation, still appellee had the right to act only within the scope of the invitation. If the invitation to look after cars in the yards at the depot, and upon the tracks at the coal chute, included the right to ride from one to the other, and on freight trains as well as on passenger trains, still that invitation would embrace only the right to ride on such trains in the place and manner which it is intended they should be ridden on. Here, it is not contended that any member of the train crew knew of appellee's presence on the train, and of course nothing could be known of his purpose. Yet at 3 o'clock in the morning, in an unlighted yard, appellee attempted to climb down the side of the car and to alight from the moving train, before it reached the coal chute, where it would stop. Moreover, this train was in motion when appellee climbed upon it and had not reached its stopping point when he attempted to alight from it, and it was under the control of the crew provided for that purpose.

The proof herein set out does not support a finding by the jury that appellee was acting within the scope of his invitation or employment at the time of his injury, and, if he was not, then appellant owed him no duty to exercise care to make the place reasonably safe for appellee to do an act, not within the scope of the invitation or employment.

We are of the opinion that appellant committed no breach of any duty to appellee, and, therefore, it is guilty of no negligence of which he can complain, and the judgment of the court below is, therefore, reversed and the cause remanded for a new trial.